Filed 12/30/22  In re A.S. CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re A.S., a Person Coming Under the Juvenile Court Law. | B320026 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>       Plaintiff and Respondent,<br><br>       v.<br><br>ASHLEY S.,<br><br>       Defendant and Appellant. | (Los Angeles County Super. Ct. No. 19CCJP02108A) |

APPEAL from an order of the Superior Court of Los Angeles County, Jean M. Nelson, Judge.  Affirmed.

Roni Keller, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, Interim County Counsel, Kim Nemoy, Assistant County Counsel, and Kimberly Roura, Senior Deputy County Counsel, for Plaintiff and Respondent.

Ashley S. (Mother) appeals a court order terminating her parental rights to her child, A.S. (Welf. & Inst. Code, § 366.26.)[1] Mother contends that her rights should not have been terminated because (1) she regularly visited A.S., who would benefit from continuing the relationship (*id.*, subd. (c)(1)(B)(i)), and (2) the requirements of the Indian Child Welfare Act (ICWA) are unmet. (25 U.S.C.S. § 1901 et seq.; Welf. & Inst. Code, § 224 et seq.) We find no error.

Mother consistently visited; however, substantial evidence shows that A.S. is upset by the visits and does not want to see Mother more often. After years of services, Mother's visits are still monitored, owing to her mental health and drug issues. To A.S.'s detriment, Mother "sought to undermine" the foster home where A.S. has lived since she was 10 weeks old. (*In re Caden C.* (2021) 11 Cal.5th 614, 637–638 (*Caden*).) There was no showing that A.S. would be harmed by severing their relationship.

Any deficiency in the ICWA inquiry did not cause a miscarriage of justice. (Cal. Const., art. VI, § 13.) Mother denied Indian ancestry; no evidence shows that her denials are incorrect or that A.S. has Indian ancestry. Because there is no reason to believe A.S. is Indian, any failure to inquire of extended family members was harmless. We affirm.

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

# FACTS AND PROCEDURAL HISTORY
## *Prior Appeals*[2]

A.S. was born in January 2019.  Two months later, Mother was hospitalized under section 5150.  Disturbed by A.S.'s crying, she "was screaming at the child to 'shut up' and observed [A.S.] stiffen up in fear."  She did not want to harm A.S. and "called for help before things 'escalated.' "  Mother yelled obscenities at a social worker (CSW) from respondent Los Angeles County Department of Children and Family Services (DCFS), who took A.S. into protective custody.  (*In re A.S., supra*, B298229.)

Mother has a history of mental illness and attempted suicide.  She is estranged from family and smokes marijuana to calm herself.  She took A.S. to the hospital a month after birth; the baby was dehydrated and so underweight that her ribs were showing.  Mother "had thoughts of hurting" A.S. but did not act on them.  She was filled with anxiety and had yelled at A.S., who would not stop crying.  Before police came to take her to the hospital, Mother was on the phone with psychiatric emergency services for over seven hours.  (*In re A.S., supra*, B298229.)

After A.S. was returned to her care, Mother called DCFS incessantly to threaten any CSW who might come to her home to assess A.S.'s welfare.  Concerned, DCFS obtained a removal order

---

[2] In this section, we summarize facts from Mother's prior appeals:  *In re A.S.* (May 1, 2020, B298229 [nonpub. opn.] (addressing jurisdiction and disposition); *In re A.S.* (Oct. 30, 2020, B304450 [nonpub. opn.] (from an order declining to give Mother custody at the six-month review hearing); and *In re A.S.* (May 17, 2021, B308364 [nonpub. opn.] (from an order declining to return A.S. to Mother's custody at the 12-month review hearing).

for A.S.; Mother cursed and threatened the CSW who carried out the order. DCFS filed a petition alleging that A.S. is at risk of serious harm because Mother cannot provide regular care or protect or supervise A.S. owing to mental illness, postpartum depression, and use of marijuana. The court detained A.S. because Mother posed a substantial threat to her and ordered monitored visits at the DCFS office because Mother made threats against A.S.'s caregivers. (*In re A.S., supra*, B298229.)

Mother did not understand why she was involuntarily hospitalized when she felt overwhelmed and needs parenting help. At age 12, she was depressed from being bullied and attempted suicide. She said, "I do not have any family member or friend for support." A.S.'s father did not visit or provide care or financial support. (*In re A.S., supra*, B298229.)

Mother became "tense and nervous" during visits with A.S. She felt safe and supported by DCFS staff in the visiting room and was frustrated that A.S. is bonding with the caregivers. Mother did not disclose her marijuana use to her psychiatrist, who "highly does NOT recommend for mother to mix her current psychotropic medications with marijuana since that will prevent her having effective outcome from her medications to address her current mental health needs." She continued to panic when A.S. cried during visits. (*In re A.S., supra*, B298229.)

Mother brought a stroller containing cat feces to a visit. A.S.'s maternal grandfather (MGF), who has a minimal relationship with Mother, told DCFS he found cat feces all around her home and asked DCFS to assess whether the home is safe for a baby. MGF voiced concern about Mother's history of substance abuse. (*In re A.S., supra,* B298229.)

The court sustained the petition on May 23, 2019, citing Mother's mental health problems and marijuana use, which interferes with prescribed medication. The unsanitary condition of her home "reflects a problem with [her] mental health" and is unsafe for an infant. The court declared A.S. a dependent, removed her from parental custody, and ordered Mother to take prescribed medications and participate in random drug testing, a parenting program, and counseling. Visits with A.S. were monitored. Mother appealed. We affirmed the jurisdictional findings and disposition. (*In re A.S., supra*, B298229.)

After disposition, Mother received assistance during visits. She was upset that A.S. slept during visits. She blamed DCFS for her problems. During a visit, Mother was upset when A.S. cried and kicked away a bottle of formula. Despite being told that A.S. did not want to eat, Mother " 'attempted to force the bottle into [A.S.'s] mouth when she was crying extremely loud.' " The monitor told Mother not to " 'force feed' " the baby; Mother objected that she was not forcing A.S. A.S. stopped crying when Mother laid her down, then resumed when Mother picked her up. (*In re A.S., supra*, B304450.)

Mother tested positive for marijuana and amphetamine. She denied marijuana use, attributed the amphetamine result to her Adderall medication, and failed to appear for the next four drug tests. Mother tried to feed A.S. pureed food while she cried; the baby gagged. Mother then tried a bottle until the monitor told her that A.S. did not want to eat. Mother had to be coached how to calm A.S. (*In re A.S., supra*, B304450.)

Mother had assistance to keep a safe home but gave "lots of excuses to postpone the cleaning and sanitizing [of] her home." There was cat litter strewn about. Mother did not understand

5

the gravity of the situation or do basic cleaning, and the home was unsafe for A.S. CSW saw a sewing needle on the floor and an unclean carpet. Mother said she spreads a blanket on the floor to cover everything. (*In re A.S., supra*, B304450.)

In August 2019, the court ordered DCFS to assess if Mother can have unmonitored visits or custody of A.S. Though she was taking medication and attending psychiatric appointments, Mother's psychologist stated that she "made very little progress" and cannot complete tasks. (*In re A.S., supra*, B304450.)

Police responded to a violent dispute in Mother's home. Her roommate Christina Z. threatened the lives of Mother, Mother's cat, and A.S.; while armed with a knife, she bit and scratched Mother. Christina said Mother photographed the foster parents' license plate to locate their home, with plans to kidnap A.S. and murder the caregivers. Mother allegedly bound, injured, and threatened to kill Christina, who escaped and called police. She accused Mother of using drugs, prostitution, and wanting custody of A.S. so she could receive welfare benefits to buy drugs. (*In re A.S., supra*, B304450.)

Mother said she picked up Christina in the streets to live in her home. DCFS was concerned that Mother lives with, in her words, a "convicted felon" and "psychotic." Mother did not advise DCFS that Christina was in her home. Their altercation showed Mother's poor judgment and reflects on her mental stability. In October 2019, the court denied Mother's request for unmonitored visits. (*In re A.S., supra*, B304450.)

Mother blamed DCFS for her shortcomings. She did not "take [A.S.'s] cues." When A.S. spat out food, Mother insisted she finish the jar. Mother told A.S., "I would appreciate it if you didn't look at [foster father] like he's your mother; it really hurt

my feelings." At a visit, Mother stared at A.S. for five or six minutes in silence, until the monitor directed her to read to A.S. Mother fed the baby in a rush with large spoonfuls, then objected when told to slow down and reduce the portion so that A.S. would not spit it out. (*In re A.S., supra*, B304450.)

The agency monitoring Mother's visits said she is "more confident and less anxious." Her relationship with the foster family was strained after she photographed their car and license plate. She tested positive for amphetamine, due to her Adderall prescription, which her psychiatrist believes helps her focus. She participated in services but her mental stability and limited support system continued to be a concern. She visited A.S. twice a week and wished to see her more often, but still needed coaching with A.S., especially with food. She also needed coaching to clean her house. (*In re A.S., supra*, B304450.)

At a contested review hearing in December 2019, the court noted Mother's efforts and progress but found that returning A.S. posed a substantial risk of detriment to the child's safety, protection, or well-being; Mother "is not yet in substantial compliance with the case plan" despite some progress toward alleviating the causes necessitating placement. Mother appealed the denial of her request for custody. This court affirmed, concluding that Mother had not eliminated the conditions leading to A.S.'s removal, and taking "an incremental approach" was not an abuse of discretion. (*In re A.S., supra*, B304450.)

In February 2020, DCFS suspected Mother was using drugs. She did not comply with directions to resume drug testing. She consistently visited A.S. but forgot necessities, including food, and once stuffed A.S.'s diapers with paper towels after forgetting diapers and refusing the ones provided by A.S.'s

caregivers. She had trouble when A.S. was fussy and said odd things such as "your grandfather is basically dead to us," which A.S. did not understand. Her house had piles of cat litter and "stuff," which prevented visits from taking place there. (*In re A.S., supra*, B308364.)

Mother did not consent to services recommended by A.S.'s doctor in 2019 because she did not want A.S.'s caregivers to participate. At uncoached visits, she was "observed to have difficulty with the child." The court denied Mother's request for unmonitored visits in June 2020 because she "often and recently acted in erratic ways," tested positive for marijuana and missed tests. She accused the drug lab of using "dirty pee" and faking her failure to test; she accused DCFS of instructing the lab to alter her urine samples; and accused the caregivers of trying to "steal" A.S. She stopped attending psychotherapy. (*In re A.S., supra*, B308364.)

At the 12-month hearing in October 2020, Mother asked the court to return A.S. to her care. The court denied Mother's request because of her positive drug tests. Over the objections of DCFS, the court ordered unmonitored visits. On appeal, we affirmed the court's order. (*In re A.S., supra*, B308364.)

### Subsequent Reports and Proceedings

In November 2020, DCFS asked the court to reinstate visit monitoring. Mother yelled at CSW, who was trying to arrange visits; CSW had to hang up the phone. At an unmonitored visit, A.S. hit her head and sustained an abraded, swollen lip. Two weeks later, she returned from Mother's home with abrasions on her spine and shoulder. Mother said the caregivers caused the injuries. She twice tested positive for methamphetamine, and accused CSW, the drug testing lab, and A.S.'s doctors of bias.

8

Mother prevented A.S. from seeing development experts. DCFS felt Mother's mental health issues persisted. She uses drugs and believes DCFS plans "to sell" A.S.

The court reinstated visit monitoring and ordered Mother to test for drugs weekly and undergo a psychological evaluation. It transferred educational rights to A.S.'s caregivers. In February 2021, a USC mental health evaluator reported that Mother has a personality disorder, trauma and stress disorder, cannabis use disorder, substance abuse disorder with presumed stimulant use, and attention deficit/hyperactivity disorder (ADHD). Her mental conditions could interfere with her ability to safely parent A.S.

The report details the course of DCFS proceedings. It notes that Mother's positive tests for methamphetamine resulted from use of the drug, not from any over-the-counter medication. Mother blamed her positive results for cannabis on her proximity to someone who uses it, and attributed her methamphetamine results to Nyquil, Adderall, or alteration of her urine sample by the drug testing lab.

The evaluation states that Mother was diagnosed with ADHD in childhood; she reported long-standing "issues with mood" and a suicide attempt at age 12. She did not medicate for her conditions for over a decade, until the DCFS case began. Her toxicology test results suggest that she does not take Adderall consistently. Mother had no idea why this case is still underway. She said she responded to DCFS "bullying" with anger. Now, she tries to compliment DCFS staff, though she doubts they are trying to help her.

The evaluator opined that Mother's mental conditions could impair parenting by affecting bonding or her ability to monitor or

supervise A.S.  It could cause distress to the child and result in missed appointments and limited care, treatment, and education. Lack of family support is a concern.  A.S.'s developmental delays demand a high level of parental attention, patience, and care. Mother has low tolerance of frustration, high emotional reactivity, and lacks empathy.  This affects her interactions with DCFS and willingness to secure recommended care for A.S. Substance abuse significantly impacts parenting.  A.S. is at risk of inconsistent care and supervision from Mother's functional deficits, if they remain untreated.

The evaluator recommended that Mother have weekly psychotherapy with someone trained in personality disorders, trauma, and substance abuse; a long-term substance abuse treatment program; psychiatric medication with monitoring for adherence; parenting programs; and supervised visitation with A.S.  Future reunification would depend on Mother's adherence with court orders and treatment, and demonstration of effective parenting skills.

In a status review, DCFS reported that on April 4, 2019, Mother signed a Parental Notification of Indian Status (ICWA-020) form, and the court found no reason to know A.S. is an Indian Child; she was ordered to keep DCFS, the court, and her attorney aware of any new information relating to ICWA status.  The court also determined that Steven R. is A.S.'s alleged father.

A.S., age two, is well cared for; her caregivers take her to medical visits and arranged for development services once they obtained educational rights.  A.S.'s speech is progressing; she can now put words together.  She receives services to address self-harming behavior at bedtime.

Mother lives with a friend and is reconnecting with MGF. She participates in services, takes prescribed medications, and insists that she never used methamphetamine. DCFS agreed to monitor longer visits and Mother agreed to have positive communications with DCFS. Her coached visits with A.S. are consistent and go well. Mother said she saw "drugs" between A.S.'s toes, which CSW observed was lint from the child's socks. The whereabouts of A.S.'s alleged father are unknown. Mother has a tense relationship with the caregivers, who said she made false accusations about them. They asked that Mother's virtual visits with A.S. be monitored. Mother was angry that A.S. called her caregiver "daddy."

DCFS wrote that Mother genuinely loves A.S., visited consistently, and improved her parenting skills. However, "it appears that mother continues to struggle with mental health issues and drug use, which [affect] behavior and instability." DCFS reported that in April to May 2021, Mother tested positive for marijuana four times and failed to test once. DCFS asked the court to terminate reunification services.

At the hearing on May 17, 2021, DCFS argued that Mother has not progressed after more than two years of services. The sustained petition relates to her mental health and marijuana use, yet she continues to use marijuana, in high amounts, and has not seen her therapist since June 2020. Mother believes she reached her treatment goals, but her mental health evaluation recommends weekly therapy to address personality disorders and substance abuse. Mother is self-medicating and creating impediments to reunification.

Counsel for A.S. asked the court to terminate Mother's services. After acknowledging Mother's love for A.S., counsel

11

argued she has not made substantial progress. She recently used marijuana and is not adherent with prescribed medication. She "is not grounded in reality which poses a risk to the child," fabricated accusations against the caregivers and her therapist, and harmed A.S. by refusing developmental services.

Mother addressed the court. She denied ever taking methamphetamine and said she uses marijuana to help cope with the "meth accusations" and the dependency proceeding.

Mother's counsel argued that DCFS did not provide reasonable services. Mother participated in the case plan and had meaningful visitation. She denied using methamphetamine. Even if her positive drug tests are correct, DCFS failed to show that Mother's drug use affects her ability to parent or poses a risk to A.S. The mental health report ruled out psychotic disorders. Her thinking is logical and any conflict she has with DCFS is caused by stress. She and A.S. have a strong bond. Mother was not assisted in finding a therapist who specializes in personality disorders.

The court terminated services because "the problems that brought the case in persist with little or no change over time." Mother is using a "really high" amount of marijuana "as a crutch and to self-medicate," though it interferes with her prescribed medication. She does not regularly take Adderall. The court cited Mother's conflicts with the caregivers, the visitation monitor, and DCFS as showing a mental health problem. She "elevates quickly" when confronted or challenged, and children present daily challenges as they become independent. A.S. "is a very young child, so Mother's mental health must be more stable than it has been."

12

The court praised Mother for seeking help when she had an aggressive response to her newborn, but "she has not been able to progress further." The mental health evaluation showed the same problems that were present when the case started. Mother's "overreaction to basic things and people" affect "her judgment and ability to parent." Her refusal to obtain developmental services for A.S. "because she was angry and frustrated that the caregivers have developed a bond" with A.S. "was not in the best interest of her child."

The court concluded that returning A.S. to Mother's physical custody would create a substantial risk of detriment, DCFS made reasonable efforts to offer Mother services, and her progress was not substantial. It set a hearing to select a permanent plan. Mother's visits must be monitored.

After the hearing, DCFS attempted to locate alleged father Steven R., but was unsuccessful without having his birthdate. He never visited A.S. or contacted DCFS. The court ordered notice by publication.

DCFS submitted a report for the section 366.26 hearing. A.S. had a "steady weight gain" and growth, despite Mother's insistence that she is underweight. Mother threatened to sue the pediatrician and DCFS. A.S. developed language skills with speech therapy and receives services for self-harming behavior.

A.S. is adoptable. Her caregivers are approved for adoption and wish to provide a permanent and loving home. She has lived with them since she was 10 weeks old and they are bonded. DCFS recommended adoption as the permanent plan. Mother and A.S. enjoy each other's company during monitored visits. She still panics when A.S. cries. The court continued the section

13

366.26 hearing, at Mother's request, and ordered a bonding study.

While awaiting the bonding study, DCFS reported that A.S. refers to the caregivers as her parents. Her language skills have increased, with use of multiword sentences and good enunciation. During a visit, Mother became upset when A.S. referred to the caregiver as "mom." Mother told A.S. that the caregiver "is a thief. She wants to steal you from me." CSW reprimanded Mother, who would not listen. She was "angry and loud." CSW warned Mother not to "badmouth" the caregivers in front of A.S. Mother replied that if A.S. refers to the caregivers as her parents, she "will continue to let [A.S.] know that they are thieves." She feels they are "lying to the child saying they are her family." Mother complained that A.S. used the word "vagina," saying the caregivers "must be exposing her to inappropriate sexual behavior and must be raping her." The monitor did not hear A.S. use that word. Mother threatened to "sue everyone." DCFS received a referral alleging child abuse by the caregivers but rejected it as Mother's effort to jeopardize A.S.'s placement. CSW fears Mother has a negative impact on A.S., who is closely bonded to the caregivers.

At a hearing, the court said it was "very concerned [Mother] is trying to sabotage the placement" and instructed the visitation monitor to end visits when Mother says anything inappropriate.

In February 2022, DCFS reported that it took A.S. to monitored visits, twice a week, for three years. Mother said the caregivers are teaching A.S. to be prejudiced against "fat people," which they denied. Mother asked CSW, "Is that why they lie and try to steal from me? Because they are also illegally prejudiced?" CSW tried to discuss this with Mother but she screamed and

14

yelled, and CSW had to end the call. After seeing Mother, A.S. tells her dolls, "no, no, that is not your mom." She stops herself when she calls the caregiver "mom" and seems confused. A.S.'s teacher wrote that when A.S. returns to school after visiting Mother, she is "teary-eyed" and "really upset" when asked what is wrong. The bonding study was delayed because Mother did not make an appointment for four months.

The psychologist's bonding study was filed in March 2022. Mother admitted marijuana use but denied methamphetamine use. She blamed DCFS and her lawyer for A.S. being in foster care. After watching three visits, the evaluator observed that A.S. has "a strong attachment" to the caregivers; she was reluctant to leave them and ran to them, suddenly animated and happy, when visits end. A.S. did not try to sit near Mother, climbed off Mother's lap, shook her head "no" when Mother asked if she would like to see Mother more often, and did not reply when Mother said, "I love you," at the end of a visit. A.S. was hungry, but Mother did not bring food to the visit. A.S. was not upset when visits end. The caregivers reported that before visits with Mother, A.S. had nightmares and "peed in her pants, though she was fully potty trained."

The evaluator "was struck" that A.S. "did not make affectionate moves" toward Mother, turning her face away three times when Mother tried to kiss her cheek and resisting getting in Mother's lap. A.S. asked if she could take a treat from Mother "home," i.e., to the caregivers. The visitation monitor said that after visits A.S. says she wants to "go home" or see "Muti and Papa" (the caregivers). A.S. regressed when her usual monitor was on vacation, suggesting that she may not feel safe with Mother without the monitor present.

The study concludes that A.S.'s "primary attachments or bonds are with the caregivers, since she has been with them since she was 10 weeks old. . . . In her mind, they are her parents. Her relationship with [Mother] appears to be one of a playmate or now-familiar adult who cares about her and gives her rewards and treats."

DCFS reported that Mother recorded visits with A.S. in violation of a court order, but refused to stop when asked to do so. She told the monitor to "call your bitch off," referring to CSW. Mother was upset when A.S. said, "I am going to home to see my family," and told the child, "I am your family." She demanded that A.S. be removed from the caregivers. DCFS wrote that Mother's visits "upset and confuse" A.S. The maternal grandmother (MGM) spoke to CSW and asked to care for A.S. MGM never visited A.S. in three years, saying "there were too many cooks in the kitchen." CSW called MGM when A.S. was detained in 2019, but MGM did not return the call.

The section 366.26 hearing was conducted in April 2022. The court granted the caregivers de facto parent status, over Mother's objection. Mother testified that she has visited A.S. twice a week, for two hours, for three years. They read, watch television, play games, and paint A.S.'s nails. The relationship is very affectionate and A.S. says, "I love you."

After initially stating that her relationship with DCFS is "friendly," Mother next said it is "contentious." She tried to get along but DCFS had no interest and would not help with reunification unless the court pushed it. CSW "gaslit" Mother when MGM called to express interest in adopting A.S. Mother admitted having a bad relationship with the foster parents

16

because they are dishonest, kept her away from A.S. for no reason, and interfered with reunification.

A.S.'s attorney asked the court to terminate parental rights. A.S. would not benefit from continuing the relationship, and "visits have had an ongoing negative effect" on her. Ending the relationship would not be detrimental to A.S. Mother asserted that A.S. sees Mother as her parent and is relaxed in her presence, if not overly affectionate. DCFS focused too much on Mother's mental health, conflicts with CSW, and lack of progress in treatment. Mother has been a constant presence in A.S.'s life. DCFS argued that the focus should be on the best interest of the child, not Mother's interests. At Mother's monitored visits, A.S. sees her as a playmate or familiar adult. A.S. views the caregivers' home as her home, is bonded with them, and it would not be detrimental to end visits or her relationship with Mother.

The court acknowledged Mother's diligence in visiting A.S.; however, their bond is not a substantial and positive attachment that would significantly benefit A.S. from its continuation. Mother is limited to structured monitored visits. A.S. clearly views the caregivers as her primary parents, a bond that Mother has tried to sabotage. Mother's disruptive behavior would continue, to A.S.'s detriment, if parental rights are not terminated. Continued contact with A.S. "will confuse the child more and more as she ages, as Mother tries to drive a wedge between herself and the caregivers," which will cause A.S. to feel guilty and could disrupt her relationship with the caregivers entirely. MGM and MGF have no bond with A.S., so it is too late for them to be interested in adoption.

The court concluded that the benefit of adoption outweighs any detriment from ending A.S.'s relationship with Mother. A.S. is adoptable and thriving with her caregivers. The parental bond exception to adoption was not proven by a preponderance of the evidence. The court terminated parental rights and identified the permanent plan as adoption. It ended Mother's visits.

## DISCUSSION

### 1. Termination of Parental Rights

At the selection and implementation hearing, the court "shall terminate parental rights" if a child is likely to be adopted. (§ 366.26, subd. (c)(1); *In re Celine R.* (2003) 31 Cal.4th 45, 49; *In re S.B.* (2009) 46 Cal.4th 529, 532.)[3] Adoption is the permanent plan preferred by the Legislature. (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 574.) "But if the parent shows that termination would be detrimental to the child . . . the court should decline to terminate parental rights and select another permanent plan. . . . '[T]he statutory exceptions merely permit the court, in exceptional circumstances [citation], to choose an option other than the norm, which remains adoption.' " (*Caden, supra,* 11 Cal.5th at pp. 630–631.)

Mother asserts that parental rights cannot be terminated because the "parental benefit exception" to the policy favoring adoption applies. (§ 366.26, subd. (c)(1)(B)(i).) As discussed below, the record does not support her claim.

The parental benefit exception requires a parent to show that (1) the parent regularly visited the child, (2) the child would benefit from continuing the relationship, and (3) terminating the relationship would be detrimental to the child. "[T]he exception applies in situations where a child cannot be in a parent's custody

---

[3] Mother does not dispute that A.S. is likely to be adopted.

but where severing the child's relationship with the parent, even when balanced against the benefits of a new adoptive home, would be harmful for the child." (*Caden, supra,* 11 Cal.5th at pp. 629–630.) It "rests on a variety of factual determinations properly reviewed for substantial evidence [but] the ultimate decision that termination would be harmful is subject to review for abuse of discretion." (*Id.* at p. 630.)

The first element is satisfied. The record shows, and the parties agree, that Mother regularly visited A.S. to the extent permitted by court orders. Consistent visits allow a parent and child to develop a significant, positive emotional attachment. (*Caden, supra,* 11 Cal.5th at p. 632.)

Next, we focus on A.S.'s best interest to assess if she would benefit from continuing the relationship. This element is affected by " '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.' " (*Caden, supra,* 11 Cal.5th at p. 632.) Third party witnesses, including psychologists, can provide relevant evidence about the parent/child bond. (*Id.* at pp. 632–633.)

Substantial evidence supports the court's finding that A.S. does not benefit from her relationship with Mother. The record generated over three years shows that A.S. was only briefly in Mother's care. A month after birth, she was dehydrated and so underweight that her ribs were showing; soon after, A.S. was endangered by Mother's extreme reactions to her cries. She was detained and has spent the rest of her life out of Mother's custody. Mother's visits are monitored for A.S.'s safety. A.S.'s development was adversely impacted by Mother, who heedlessly thwarted recommended special needs services for petty reasons.

Witnesses provided insight into Mother's bond with A.S. The USC psychiatrist opined that Mother's mental conditions

19

affect her ability to bond with and safely supervise A.S.  Mother needs weekly psychotherapy and to avoid drug use.  However, she ceased psychological care in June 2020 and continues to use marijuana; it interferes with her prescribed medication, which she does not consistently take.

Visits have a negative impact on A.S.  She has nightmares and urinary incontinence before visits.  A.S.'s teacher wrote that after A.S. sees Mother, she is "teary-eyed" and "upset."  A.S. acts out her distress with dolls, saying "no, no, that is not your mom."  Mother says derogative things to A.S. about the caregivers, calling them "thieves" trying to "steal" her; she is playing mental games with a three-year-old to sabotage her placement.  Mother said she intends to continue telling A.S. that the caregivers are not her family.  The bonding study shows A.S. is primarily attached to her caregivers.  The court justifiably found that Mother's cruel conduct is "very damaging" to A.S.  Mother feels a positive emotional attachment but A.S. "does not."

Finally, the court must decide if "it would be harmful to the child to sever the relationship and choose adoption."  (*Caden, supra,* 11 Cal.5th at p. 633.)  The question "is how the child would be affected by losing the parental relationship—in effect, what life would be like for the child in an adoptive home without the parent in the child's life." (*Ibid.*)  A bonding expert may opine whether the child would suffer from losing the biological parent or benefit from alleviating the emotional instability and anxiety associated with facing an uncertain future home.  (*Ibid.*)

Acting in the child's best interest, the court determines "whether the harm of severing the relationship outweighs 'the security and the sense of belonging a new family would confer.' [Citation.]  'If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that,' even considering the benefits of a new

adoptive home, termination would 'harm[]' the child, the court should not terminate parental rights. . . . When the relationship with a parent is so important to the child that the security and stability of a new home wouldn't outweigh its loss, termination would be 'detrimental to the child *due to'* the child's beneficial relationship with a parent." (*Caden, supra,* 11 Cal.5th at pp. 633–634.)

The record shows that the benefit of a permanent adoptive home outweighs any possible detriment posed by severing A.S.'s relationship with Mother. The bonding study indicates that A.S. would not be harmed: She has lived with the caregivers since infancy and "[i]n her mind, they are her parents," not Mother. Mother upsets A.S. by reprimanding her when she refers to the caregivers as her parents. A.S. repeatedly turned away when Mother tried to kiss her. The study states that Mother's relationship is "one of a playmate or now-familiar adult who cares about [A.S.] and gives her rewards or treats." The study offers firsthand observations; it was not terse or conclusory. (*In re M.G.* (2022) 80 Cal.App.5th 836, 850 [bonding study briefly described a parent-child video visit].)

A playmate or friend does not represent the type of substantial, positive emotional attachment that outweighs the security of belonging to the family who has cared for A.S. nearly her entire life. There is no showing, in the bonding study or elsewhere, that A.S. would be harmed by severing the natural parent/child relationship. A.S.'s attorney asserted that Mother has "an ongoing negative effect" on the child. The court's determination that A.S. would not be harmed was not arbitrary, capricious, or patently absurd. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318 [abuse of discretion standard].)

In sum, the court did not err by selecting termination of parental rights and implementing a plan of adoption. Mother

21

was appropriately credited for her consistent visitation.  But the problems leading to A.S.'s 2019 detention—Mother's mental health and drug use—were never resolved.  As a result, she is limited to monitored visits despite years of services.  "[A] parent's inability to overcome the issues that led to the dependency is not a categorical bar to applying the exception," though it is relevant to the inquiry.  (*In re J.D.* (2021) 70 Cal.App.5th 833, 852–853.)  A parent who gains "understanding of herself and her children's needs" with mental health treatment may be able to ensure "positive" interactions, which is relevant to whether the child would benefit from continuing the relationship or be harmed from losing it.  (*Caden, supra,* 11 Cal.5th at pp. 637–638.)

A.S. has no significant attachment to Mother, whom she sees as a friend, not as a parent.  Mother still panics when A.S. cries, despite one-on-one coaching.  A guardianship is untenable, especially when the evidence shows that A.S. is upset before and after visits; Mother is hostile to the caregivers; and visits require monitors.  (Compare *In re J.D., supra,* 70 Cal.App.5th at pp. 855–856 [child lived with his mother for three years before detention, a therapist noted their positive affectionate relationship, and he was happy after visits].)

If parental rights are not terminated, A.S. would be damaged by Mother's increasingly desperate efforts to drive a wedge between A.S. and her caregivers:  Mother denigrates them in front of A.S. and fabricates reports of child abuse.  A.S. could lose her placement with the only family she recognizes.  Under the circumstances, A.S.'s interests are best served by severing the parental relationship and providing her with permanence and stability in the adoptive home.

## 2. ICWA Does Not Require Conditional Reversal

Mother argues that no one questioned her relatives about Indian ancestry. The record shows she denied knowing that A.S. has any Indian ancestry in March 2019; in April 2019, she signed an ICWA-020 form declaring, "I have no Indian ancestry as far as I know." She described alleged father Steven R. as a white supremacist; he never visited A.S. and cannot be located. Mother was raised by MGM and is in contact with MGF. She has no other living relatives—siblings, cousins, aunts, or uncles. At the outset of the case, DCFS left a message for MGM, who never called back. MGF spoke to DCFS in 2019 but it is unclear if he was asked about Indian ancestry. At the section 366.26 hearing, the court asked if ICWA was investigated; no one objected when DCFS said it was.

We review ICWA findings under a substantial evidence standard. (*In re Rebecca R.* (2006) 143 Cal.App.4th 1426, 1430.) If undisputed facts show the initial inquiry into Indian heritage was deficient, we determine whether the deficiency invalidates findings that ICWA does not apply. (*In re Dezi C.* (2022) 79 Cal.App.5th 769, 777, review granted Sept. 21, 2022, S275578, (*Dezi*).) DCFS contends that any failure to ask MGM or MGF about A.S.'s ancestry is harmless. We agree.

ICWA establishes standards to follow before an Indian child is removed from parental custody. (*In re Austin J.* (2020) 47 Cal.App.5th 870, 881–882.) An "Indian child" is "either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." (25 U.S.C.S. § 1903(4); Welf. & Inst. Code, § 224.1, subd. (a).) From "the initial contact" with a family, DCFS and the court have "an affirmative and continuing duty to inquire" whether a child "is or may be an Indian child." (Welf. & Inst. Code, § 224.2,

23

subd. (a).)  This means "asking the child, parents, legal guardian, Indian custodian, extended family members, and others who have an interest in the child . . . whether the child is, or may be, an Indian child." (*Id.*, subd. (b).)  At initial appearances, the court must ask if a participant knows whether the child is Indian.  (*Id.*, subd. (c).)  Additional inquiry and notice to tribes is required only if there is "reason to believe" or "reason to know" that the child is Indian.  (*Id.*, subds. (d), (e) & (f).)

Mother does not claim membership in a federally recognized tribe or assert that A.S. is eligible for membership as the child of a member of an Indian tribe.  (25 U.S.C.S. § 1903(4).)  She was questioned by DCFS and denied Indian ancestry.  DCFS spoke to MGF, then briefly to MGM but apparently did not inquire about Indian ancestry.  Mother argues that this lapse mandates reversal.[4]

Some courts have held that failure to question extended family members requires automatic reversal "no matter how 'slim' the odds are that further inquiry on remand might lead to a different ICWA finding by the juvenile court." (*Dezi*, *supra,* 79 Cal.App.5th at p. 777, rev.gr.)  We do not follow the automatic reversal rule.  (*Id.* at pp. 782–785.)  "In our view, an agency's failure to conduct a proper initial inquiry into a dependent child's American Indian heritage is harmless unless the record contains information suggesting a reason to believe that the child may be an 'Indian child' within the meaning of ICWA, such that the absence of further inquiry was prejudicial to the juvenile court's

---

[4] Mother does not argue that DCFS improperly failed to determine if A.S.'s alleged father is Indian.  He could not be interviewed because he never contacted DCFS, could not be found with a due diligence search, and had to be served by publication.

24

ICWA finding.  For this purpose, the 'record' includes both the record of proceedings in the juvenile court and any proffer the appealing parent makes on appeal." (*Id.* at p. 779, fn. omitted.)

The record shows no reason to believe A.S. is an Indian child.  Mother denied Indian heritage.  She was raised by MGM and was in contact with MGF.  When parental rights were terminated, Mother was living with MGM.  Unlike the mother in *In re Y.W.* (2021) 70 Cal.App.5th 542, 548, who was adopted at age two and lacked information about her biological family, there is no concern that Mother does not know her heritage.  Though Mother has a history of mental illness, there is no indication that she is too ill to know who she is.  In short, Mother points to nothing in the record indicating possible Indian heritage nor does she make a proffer on appeal of such heritage.  (*Dezi, supra,* 79 Cal.App.5th at p. 786, rev.gr.)

A judgment cannot be set aside unless it has resulted in a miscarriage of justice, meaning "it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*People v. Watson* (1956) 46 Cal.2d 818, 836; *Dezi, supra,* 79 Cal.App.5th at p. 779, rev.gr.)

Mother has not shown a miscarriage of justice.  She denied Indian heritage to DCFS, and never said anything to the contrary to the court.  Her attorney did not object to the adequacy of the ICWA inquiry, or to the court's ICWA findings, or suggest that Mother has Indian ancestry.  (*In re Ezequiel G.* (2022) 81 Cal.App.5th 984, 1013.)

## DISPOSITION

The order terminating parental rights is affirmed.

NOT TO BE PUBLISHED.

                                            LUI, P. J.

We concur:


ASHMANN-GERST, J.


HOFFSTADT, J.